UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
........................................................................................................

UNITED STATES OF AMERICA,

       - against -

GLENDON SCOTT CRAWFORD, et al.

........................................................................................................

Motion to Dismiss and Omnibus Motion
Pursuant to Rule 12(b)

Case No. 14-CR-00030 (GLS/CFH)

## <u>INTRODUCTION</u>

Defendant Glendon Scott Crawford (hereinafter referred to as "defendant" or "Crawford"), by his attorneys Luibrand Law Firm, PLLC (Kevin A. Luibrand of counsel), herein moves for the following relief:

1.    an order dismissing Count One of the indictment which alleges an "attempt" by defendant to "*use* a device capable of and designed and intended to endanger human life" pursuant to 18 U.S.C. §2332(h) [*ECF document 22, page 1*];

2.    an order dismissing Count Two of the indictment which alleges that defendant "conspired to *use* a weapon of mass destruction" [*ECF document 22, page 2*];

3.    an order dismissing Counts One and Two of the indictment on the grounds that the claimed plot that involved defendant was instigated, planned, funded, supplied and maintained by the government constituting "outrageous government conduct" and a violation of Crawford's due process rights;

4.    an order precluding the government from introducing evidence of or referencing in any manner defendant's relationship in the Ku Klux Klan and any reference by him to or opinions of government official or bodies under FRE §404;

5.    an order directing the conduct of a <u>Massiah</u> hearing with respect to statements claimed to have been elicited from Crawford by an unnamed jailhouse informant;

1

6.      an order directing that the government produce all communications by and among the undercover informants and uncover federal agents (collectively "undercovers") in connection with all actions pertaining to Crawford; and

7.      an order directing that the government provide items of discovery not specifically included in the government's disclosure.

<u>BACKGROUND</u>

From April, 2012 to Crawford's arrest on June 18, 2013, the period alleged in the indictment as the beginning and end of the criminal offenses [*ECF document 22 at page 2*], defendant had contact with undercovers with respect to the recitation of facts set forth in the criminal complaint.  Fifty-nine (59) agents from federal government agencies and New York State are shown in the discovery as having worked on the lead up to Crawford's arrest.  The more than 7,700 pages of discovery materials and over fifty (50) audio and video recordings – all made by undercovers in rooms or on the phone with Crawford - disclose the scope of communications between the undercovers and Crawford.

This was not a case where an undercover infiltrated a criminal enterprise. Rather, no criminal enterprise existed when the undercovers had contact with Crawford, and the criminal enterprise became, over time, all of the undercovers and, according to the indictment, Crawford and Eric Feight.  The government's fourteen (14) month effort resulted in a meeting in a Schaghticoke, New York garage supplied by the government on June 18, 2013, with claimed x-ray equipment, supplied to and delivered there by the government.  The video and audio recorded activity of the defendant, who was present in the garage with the undercovers, was to read directions from manuals provided by the undercovers, talk with the undercovers about technical aspects of the machinery, look over the machinery provided by the undercovers, and ultimately open the back of a

mechanical box, look at it, return the back on, and then tell the undercovers ""There is this thing called leagues, and I am not in this one." [*Appendix B (recording)* (see time mark 14:50 to end)]  Crawford was arrested minutes afterwards while still in the garage.

## LEGAL ARGUMENT

## GENERAL

Crawford requests that the Court dismiss Counts One and Two of the indictment based upon the legal insufficiency of those counts, and, specifically, the invalidity of the construction given by the indictment of the statutes on which those counts of the indictment were founded, and on the facial insufficiency of the indictment.  *See* U.S. v. Hastings, 296 U.S. 188, 56 S.Ct. 218 (1935); U.S. v. Burroughs, 289 U.S. 159, 53 S.Ct. 574 (1933).

## POINT I

## COUNT ONE OF THE INDICTMENT

Count One of the indictment alleging violation of 18 U.S.C. §2332h was not charged in the original 182-paragraph criminal complaint against Crawford.  [*ECF document 22, page 1*]  The pertinent part of Count One reads as follows:

> From at least in or about April 2012, to on or about June 18, 2013, in Albany, Rensselaer, Saratoga, and Schenectady Counties in the Northern District of New York, and elsewhere, in an offense occurring in and affecting interstate and foreign commerce, defendant GLENDON SCOTT CRAWFORD, without lawful authority, did knowingly attempt to produce, construct, acquire, transfer, receive, possess, and use a device capable of and designed and intended to endanger human life through the release of radiation and radioactivity, **specifically** an industrial-grade x-ray system that the defendant **planned to modify** so that it could be activated from a remote location, all for the purpose of causing serious injury and death to human beings, in violation of Title 18, United States Code, Section 2332h(a) & (c)(1).

(Emphasis supplied.)

The statute under which this is charged, Title 18, United States Code, Section 2332h(a) & (c)(1), reads as follows:

§ 2332h.  Radiological dispersal devices

(a) Unlawful conduct.

(1) In general. Except as provided in paragraph (2), it shall be unlawful for any person to knowingly produce, construct, otherwise acquire, transfer directly or indirectly, receive, possess, import, export, or use, or possess **and** threaten to use—

(A) any weapon that is designed or intended to release radiation or radioactivity at a level dangerous to human life; or

(B) any device or other object that is capable of and designed or intended to endanger human life through the release of radiation or radioactivity.

(2) Exception. This subsection does not apply with respect to—

(A) conduct by or under the authority of the United States or any department or agency thereof; or

(B) conduct pursuant to the terms of a contract with the United States or any department or agency thereof.

(c) Criminal penalties.

(1) In general. Any person who violates, or attempts or conspires to violate, subsection (a) shall be fined not more than $ 2,000,000 and shall be sentenced to a term of imprisonment not less than 25 years or to imprisonment for life.

18 USCS § 2332h (emphasis supplied).

### a. *Count One of the Indictment Does Not Factually Allege the Necessary Elements of §2332h(A)(1) Within the Four Corners of the Count*

Federal Rules of Criminal Procedure Rule 7(c) reads, in pertinent part:

The indictment…must be plain, concise, and definite written statement of the <u>essential facts</u> constituting the offense charged…

(Emphasis supplied.)

Section 2332h requires factual allegations of both sides of the criminal statute, specifically, as alleged in the indictment, that:

> Defendant Glendon Scott Crawford, without lawful authority, did knowingly attempt to produce, construct, acquire, transfer, receive, possess,
>
> and
>
> use a device capable of and designed and intended to endanger human life through the release of radiation and radioactivity.

[*ECF document 22, page 1*]

The indictment then factually qualifies the Section 2332h allegations of Crawford's alleged Section 2332h(a)(i) criminal conduct by factually describing conduct of Crawford that, if proven, would <u>not</u> constitute a crime under 18 U.S.C. §2332h:

> "specifically an industrial-grade x-ray system that the defendant *planned to modify* so that it could be activated from a remote location…"

[*ECF document 22, page 1* (emphasis supplied)]

While the indictment recites Section 2332h in the first instance as the predicate to Count One, it then qualifies the allegations by making "specific" allegations as to the claimed Count One criminal conduct that do *not* meet the statutory construction of Section 2332h.  The factual allegation in the indictment alleging that defendant "planned to modify" is not equivalent nor does it satisfy the Section 2332h element that defendant knowingly "attempted to produce, construct, acquire, transfer, receive or possess" a radiation device.  The government alleges that the defendant "*planned* to modify [an industrial grade x-ray system] so that it could be activated", which does not meet in either of the two necessary §2332h actions, specifically that Crawford attempted to "produce, construct, acquire, transfer, receive, possess" and "use" a device.  According

to the indictment, Crawford was "planning to modify".  As a matter of statutory construct, "*planning* to modify" does **not** equal "attempt to produce…and use" a device capable and designed to release radiation, and therefore does not satisfy the statutory pleading requirement.  Count One of the indictment does not meet the statutory requirement of 2332h(a).

For that reason, Count One must be dismissed.

### b. Section 2332h Inclusion of the Word "Use" Without a Definition is Unconstitutionally Vague

"[B]efore striking a federal statute as impermissibly vague, [trial courts are] to consider whether the prescription is amenable to a limiting construction" (Skilling v. United States, 561 U.S. 358 (2010).  "[E]very reasonable construction must be resorted to, in order to save a statute from unconstitutionality".  The Skilling court held that "[w]e have accordingly instructed 'the federal courts . . . to avoid constitutional difficulties by adopting a limiting interpretation if such a construction is fairly possible.'  Boos, 485 U.S., at 331, 108 S. Ct. 1157, 99 L. Ed. 2d 333; *see* United States v. Harris, 347 U.S. 612, 618, 74 S. Ct. 808, 98 L. Ed. 989 (1954)".

The second clause in Section 2332h(a) required to be alleged by the government is that defendant "threaten to use" the device, and reads as follows:

> it shall be unlawful for any person to knowingly produce, construct, otherwise acquire, transfer directly or indirectly, receive, possess, import, export, or use, or possess **and** threaten to use…

(Emphasis supplied.)   While Section 2332h requires threaten to "use", "use" is not defined in 2332h, nor in the definition section of Section 2331, which covers Chapter 113B Terrorism and 2332h. 18 U.S.C. §2332h has been reviewed by courts only seven times since its inception, none of which has addressed the definition of "use".   In

addition, the statute has an irreconcilable language of the conjunctions "and" and "or" to the extent that the statute is vague.

Section 2332h is unconstitutionally vague because it does not define "use" nor is there any statutory definition of "use".

### c. The Government Cannot Prove That Defendant Attempted to "Use a Device Capable and Designed and Intended to Endanger Human Life"

Although the government charges that the factual basis to support the indictment began "in or about April 2012, to on or about June 18, 2013", the claimed device was provided by the undercovers, brought to a warehouse operated by those government undercovers, and was not activated at the time of the arrest of Crawford on June 18, 2013. The video recording of June 18, 2013 [*CD at Appendix B*], reveals a number of box-type materials – all brought to the site by the government – and none of which are being "used" or attempted to be "used". They are in a government warehouse brought there by the government, and the recording shows defendant Crawford walking around at the encouragement of the government agents reading manuals about the machinery. In the end, Crawford closed up the machine and said, "There is this thing called leagues, and I am not in this one". [*Appendix B at time mark 14:50*]

There was no attempt made by Crawford to "use" the device; rather, the government can only establish by the surveillance video that there was a design to have government agents show Crawford the device they brought to the garage and ask him to help assemble it, and, in the end, Crawford did not.

Therefore, Count One must be dismissed for the alternative ground.

## POINT II

## COUNT TWO

## CONSPIRACY TO USE A WEAPON OF MASS DESTRUCTION

Count Two alleges that Crawford "conspired to use a weapon of mass destruction, specifically a modified industrial-grade x-ray system designed to release radiation at a level dangerous to human life, against persons and property within the United States". [*ECF document 22, page 2*]  Section §2332a reads:

§ 2332a.  Use of weapons of mass destruction

(a) Offense against a national of the United States or within the United States. A person who, without lawful authority, uses, threatens, or attempts or conspires to use, a weapon of mass destruction--

  (2) against any person or property within the United States, and

   (C) any perpetrator travels in or causes another to travel in interstate or foreign commerce in furtherance of the offense…

18 USCS § 2332a.

At no place in the government's discovery is there evidence that Crawford conspired to "use" a weapon of mass destruction.  The claimed x-ray equipment was not even assembled at the time that Crawford was in the presence of the equipment on June 18, 2013.

## POINT III

## THE INDICTMENT SHOULD BE DISMISSED BECAUSE
## THE ACTIONS OF THE GOVERNMENT TOWARD DEFENDANT
## INVOLVED OUTRAGEOUS GOVERNMENT MISCONDUCT

"[I]n an extreme case, government involvement in criminal activity [may] be so outrageous that due process principles would absolutely bar the government from

invoking judicial process to obtain a conviction …". <u>United States v. Rahman</u>, 189 F.3d 88, 131 (2nd Cir., 1999), citing <u>United States v. Russell</u>, 411 U.S. 423, 432 (1973).

When the government first had contact with Crawford, he was not committing a criminal offense.   From that beginning to his indictment, the plot alleged against defendant was instigated, planned, funded, supplied, and maintained by the government.   This wholesale government fabrication of a crime - aimed at ensnaring Crawford, who was neither previously engaged in nor was planning a similar offense - violates Crawford's due process, shocks the universal sense of justice, and demands dismissal of the indictment.

The Second Circuit in <u>United States v. Dyman</u>, 739 F.2d 762 (2nd Cir., 1984) found that "[a]s Justice Powell stated in his decisive concurring opinion in <u>Hampton v. United States</u>, supra, 'Police over involvement in crime would have to reach a demonstrable level of outrageousness before it could bar conviction.' 425 U.S. at 495 n.7 ".

## A.   An Indictment Must Be Dismissed When the Government Creates New Crimes Merely for the Sake of Pressing Criminal Charges Against the Defendant

In <u>United States v. Russell</u>, 411 U.S. 423, 432 (1973), the Supreme Court noted that "[w]e may some day be presented with a situation in which the conduct of law enforcement officials [in investigating a crime] is so outrageous that due process would absolutely bar the government from invoking judicial processes to obtain a conviction". <u>Hampton v. United States</u>, 425 U.S. 484, 495, n. 7.[1] In <u>United States v. Archer</u>, 486 F.

---

[1] <u>Hampton</u> involved a defendant who was convicted of distribution of narcotics despite his contention that the government had violated due process where illegal drugs had been supplied by a government informant and sold by the defendant to an undercover agent.   The trial court refused to instruct on this defense.   The Supreme Court affirmed the conviction, but wrote three separate opinions.   The majority opinion held that there was no separate due process defense, and that any defense had to satisfy the elements of entrapment.   Justice Powell, joined by Justice Blackmun, concurred in the result, but disagreed that governmental overinvolvement, standing alone, could never invalidate a conviction no matter how outrageous the misconduct.   The three dissenting judges argued that the

2d. 670 (2nd Cir., 1973), Judge Friendly opined that "there is certainly a limit to allowing governmental involvement in crime," and "[i]t would be unthinkable, for example, to permit government agents to instigate robberies and beatings merely to gather evidence to convict other members of a gang of hoodlums". Id. at 676-77.

Following Hampton and Russell, a number of federal courts have dismissed indictments based upon outrageous government overparticipation in a crime. *See* United States v. Twigg, 588 F.2d 373 (3rd Cir., 1978) (dismissing indictment for manufacturing methamphetamine because government committed outrageous misconduct where DEA agents "deceptively planted idea [for meth lab] in defendant's mind" and "set him up, encouraged him, provided the essential supplies and technical expertise…"); United States v. Lard, 734 F.2d 1290 (8th Cir., 1984) (reversing conviction after finding entrapment as a matter of law for defendant charged with making pipe bomb and holding, in alternative, that government committed outrageous misconduct based upon its overzealous efforts to instigate and facilitate the crime); and United States v. Greene, 454 F.2d 783 (9th Cir., 1971) (government was so enmeshed in criminal activity as to bar bootlegging prosecution where agent offered to supply equipment and operation for illegal still, supplied sugar at wholesale, urged defendants to resume production and acted as only customer for the illicit liquor).

Although the Second Circuit has yet to be confronted with outrageous government misconduct sufficient to warrant dismissal of an indictment, it has repeatedly acknowledged the availability of such a possibility. *See* United States v. Rahman, 189 F.2d 88, 131 (claim that informant's extensive participation in terrorist bombing plot constituted outrageous government misconduct "might in principle prevail

---

defense of entrapment should focus on police conduct and that the behavior of the law enforcement officers was sufficiently offensive to bar conviction.

even where, as here, the defendants were not entrapped by the government")[2]; United States v. Schmidt, 105 F.3d  82, 91 (2nd Cir., 1997); United States v. Ascencio, 873 F.2d 639, 640 (2nd Cir., 1989); United States v. Nunez-Rios, 622 F.2d 1093, 1098 (2nd Cir., 1980).

The Second Circuit has also noted the defense of outrageous misconduct is difficult, but not impossible, to establish.[3]  "A claim that the government has acted outrageously is taken seriously because ensuring that the government does not trample in an unconscionable manner on individual dignity is a bedrock duty of judicial officers…[s]ometimes the government's involvement in manufacturing crime is demonstrably outrageous, and in those cases, the convictions of targeted defendants have been set aside."  Schmidt, 105 F.3d at 91.[4]  "Although law enforcement officers might well profit from reading the lower court's thoughtful opinion, we conclude that the court exceeded its authority."  U.S. v. Santana, 6 F.3d 1 (2nd Cir., 1993).

1.      **The Government Manufactured and Facilitated Every Material Aspect of the Charged Crimes**

Government investigatory misconduct may be established if the "government agents engineer[ed] and direct[ed] the criminal enterprise from start to finish".  United States v. Ramirez, 710 F.2d 535, 539 (9th Cir., 1983).  In fact, "in each of the cases in which an outrageous government conduct defense has succeeded, the government

---

[2] As noted in Rahman, a claim of government misconduct may be brought even by a defendant who could not prevail on an entrapment defense because of his predisposition to commit the defense.  See also United States v. Chin, 934 F.2d 393, 399 (2nd Cir., 1991) (whether investigative conduct violates a defendant's right to due process must turn on whether the government conduct, standing alone, "shocks the conscience").

[3] "In view of the courts' well-established deference to the government's choice of investigatory efforts…the burden of establishing outrageous investigatory conduct is very heavy" and most claims do not succeed.  Rahman, 189 F.2d at 131; United States v. LaPorta, 45 F.3d 152, 160 (2nd Cir., 1994).

[4] A motion to dismiss based on allegations of governmental misconduct should be raised in a pretrial motion, pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure.  United States v. Cuervelo, 949 F.2d 565, 567 (2nd Cir., 1991); United States v. Nunez-Rios, 622 F.2d 1093, 1098-1099 (2nd Cir., 1980).  See also United States v. Mausali, 590 F.3d 1077,1080 (9th Cir., 2010) (claim of outrageous government misconduct is waived unless asserted by a pretrial motion).

essentially manufactured the crime".  United States v. Bogart, 783 F.2d 1428, 1436 (9th Cir., 1986).

Even at this juncture, there is overwhelming evidence that the government agents were planning, directing, funding, and otherwise facilitating the charged plot to create a remotely operated radiation-emitting device.  Crawford was not committing any criminal offenses when there was first government contact.  The government:

a.  secured a confidential human source (hereinafter referred to as "CHS") and arranged a meeting on May 30, 2012 between defendant and the CHS [*ECF document 1, page 8*];

b.  used the CHS to introduce defendant to the first of three undercover government employees (hereinafter referred to as "UCE"s) on June 21, 2012, wherein said UCE#1 offered to provide funding and/or materials to construct a radiation emitting device [*ECF document 1, page 11*];

c.  through use of a government UCE, told the defendant that he could purchase and obtain an x-ray device;

d.  through use of a government UCE, rented a garage in Schaghticoke, New York;

e.  through use of a government UCE, acquired claimed x-ray equipment and delivered it to the government's garage;

f.  through use of a government UCE, requested that defendant come to the garage and work on the device;

g.  through use of a government UCE, provided to defendant prepaid debit cards during a meeting between defendant and the CHS on February 14, 2013 for purposes of purchasing materials necessary to build a remote initiation device [*ECF document 1, page 35*];

h.  through government UCE#1, arranged the purchase of materials necessary to assemble a remote initiation device on March 7, 2013 [*ECF document 1, page 43*];

i.  through use of a government UCE, provided defendant cash to purchase materials necessary to assemble said device [*ECF document 1, page 48*];

The most blatant evidence that the alleged scheme was a government-staged production was the financial support given to defendant by the government.  The alleged

attempted crimes were almost entirely the product of the government's labors (through use of the undercovers) and money, and the scheme would not have reached anything without the material support and funding provided by the government.

### 2. The Government Targeted a Person Who Was Not Involved in Any Ongoing Plot and Who Did Not Have Any Prior Convictions For or Connections to Terrorist Activities

Prior to the government's arrival on the scene through use of their initial undercover, defendant Crawford did not have any conviction for or involvement in conduct similar to that charged in the indictment.  Nor was he involved in any ongoing plot.  These factors strongly support dismissal of the indictment.

Government participation in a crime is far more likely to be sanctioned if the conduct was aimed at a criminal enterprise already underway.  *See, e.g.,* United States v. Rahman, 189 F.3d 88, 131 (1999) (defendants could not prevail on claim that informant's activities violated due process where, *inter alia*, the "defendants were already actively advancing a conspiracy…"); United States v. Schmidt, 105 F.3d 82, 92 (2nd Cir., 1997) ("[w]hen police do no more than facilitate a criminal enterprise started by another, due process principles are not violated"); United States v. Corcione, 592 F.2d 111, 115 (2nd Cir., 1979) (activities of informant were not outrageous where the defendant had initiated the criminal activity prior to meeting the informant and had already executed most aspects of the crime).  In United States v. Batres-Santolino, 521 F. Supp. 744, 751 (N.D. Cal. 1981), the court held that "[A]lmost all of the cases rejecting an outrageous government conduct defense involve defendants who have previously been involved in similar crimes, and/or a criminal enterprise that was already in progress at the time government agents became involved".  Batres-Santolino, 521 F.Supp. at 751, citing United States v. Russell, 411 U.S. 423, 93 S. Ct. 1637, 36 L. Ed.

2d 366 (1973); <u>United States v. Wylie</u>, 625 F.2d 1371, 1374 (9th Cir., 1980), cert. denied, 449 U.S. 1080, 101 S. Ct. 863, 66 L. Ed. 2d 804 (1981); <u>United States v. Prairie</u>, 572 F.2d 1316 (9th Cir.. 1978); <u>United States v. Reynoso-Ulloa</u>, 548 F.2d 1329, 1332, 1338-39 (9th Cir., 1977), cert. denied, 436 U.S. 926, 98 S. Ct. 2820, 56 L. Ed. 2d 769 (1978); <u>United States v. Gonzales</u>, 539 F.2d 1238 (9th Cir., 1976); <u>United States v. Greenbank</u>, 491 F.2d 184 (9th Cir., 1974).

Defendant Crawford was not involved in any ongoing enterprise or other precedent criminal activity with any connection to the crimes charges in the indictment when the government entered his life.  When the government undercovers involved themselves with defendant, there is no evidence that defendant was involved in any terrorist activities, and this investigation was far from targeting an ongoing criminal enterprise.

There is an equal absence of any evidence to suggest that defendant Crawford had previously committed crimes akin to those charged in the indictment or had any ties to individuals or organizations involved in such offenses.   Although a claim of governmental misconduct may be made even by defendants who were predisposed to commit the offense, an absence of predisposition also weighs in favor of finding outrageous misconduct.  *See* <u>United States v. Gardner</u>, 658 F.Supp. 1573, 1574 (1987) (dismissing indictment based on outrageous government misconduct where defendant charged with possessing and distributing cocaine "had no prior record and had never sold any drugs before").

   **3.**   **Without the Government's Money and Directions, Defendant Crawford Could Not Have Committed the Charged Crime**

In evaluating claims of outrageous misconduct based upon government overinvolvement, a number of courts have considered the defendant's skills and resources or lack thereof.  Outrageous misconduct is far more likely to be established if the defendant could not have committed the charged offense without government aid. *See* United States v. Batres-Santolino, 521 F. Supp. 744, 751 (N.D. Cal. 1981) (dismissing indictment on due process grounds where defendants were "obvious novices [who could not have] entered the secretive world of international drug smuggling on their own" and the crime "would not and could not have been committed but for informant's participation"); *Cf.* United States v. Rahman, 189 F.3d 88, 131 (1999) (informant's participation and facilitation of bombing plot did not violate due process where defendants "already had substantial resources and technical expertise…[and] there was no evidence that the criminal conspiracy would have foundered without the Government's entry"); United States v. Labate, 2001 WL 533714 (S.D.N.Y. 2001) (observing that claim of outrageous governmental misconduct was unlikely to prevail where defendants, without the aid of the informant "certainly had the ability to create the financial instruments or to engage in the necessary transactions to commit the crimes charged").

Here, defendant Crawford had no financial resources with which to carry out the charged crime.  Crawford did not have any money with which to fund this alleged scheme, and relied upon the money and debit cards provided by the government to purchase the parts necessary to assemble the remote initiation device.

The defendant, identified on video as an acknowledged "conspiracy theorist", worked as an industrial mechanic at General Electric.  He learned from the internet information that is taught in twelfth grade physics that a certain level of gamma rays

directed at a source could cause radiation sickness.  Defendant then contacted, among others, Congressman Gibson, area Jewish organizations and the Isreali embassy, with what he believed was a never-before considered idea – and idea only - to use on Islamic terrorists.  Until his path crossed that of the government, he had never had a device or money or motivation to become involved in an actual device.

### 4. The Due Process Defense Applies Even When the Entrapment Defense is Available and Cannot be Met

The Second Circuit in United States v. Dyman, 739 F.2d 762 (2nd Cir., 1984) found the Fifth Amendment argument found in United States v. Williams, 705 F.2d 603, 619 (2nd Cir.), cert. denied, 464 U.S. 1007, 104 S. Ct. 524, 78 L. Ed. 2d 708, 104 S. Ct. 525 (1983), "differs from entrapment: whereas the entrapment defense focuses on the state of mind of the defendant as it relates to his predisposition to commit the offense charged, the defense of 'outrageous government conduct' recognizes that 'extreme cases may arise where the government's conduct is so outrageous as to violate due process, even though the evidence permitted the jury to find that the defendant was predisposed.'  See Hampton v. United States, 425 U.S. 484, 491-95, 48 L. Ed. 2d 113, 96 S. Ct. 1646 (1976) (Powell, J., concurring joined by Blackmun, J.); United States v. Russell, 411 U.S. 423, 431-32, 36 L. Ed. 2d 366, 93 S. Ct. 1637 (1973)."

Defendant requests that both Counts One and Two be dismissed on this alternate ground.

POINT IV

**THE TRIAL SHOULD BE DEVOID OF ANY REFERENCE TO CRAWFORD'S CLAIMED ASSOCIATION WITH THE KU KLUX KLAN AND ANY REFERENCES BY CRAWFORD TO GOVERNMENT EMPLOYEES OR INSTITUTIONS UNDER RULES 403 AND 404 OF THE FEDERAL RULES OF EVIDENCE**

Throughout the recordings provided by the government in discovery are references by Crawford and the undercovers to Crawford's association with the Ku Klux Klan and opinions of government officials including President Obama, Governor Cuomo, and Hillary Clinton, as well as to institutions such as the Federal Reserve Bank.  The only basis for the government to introduce such evidence would be character evidence under Rule 404.  "Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait."  (*See* Rule 404(a)(1).)  None of the exceptions set forth at Rule 404(a)(2) apply.

If the government offers a theory of admissibility under Rule 403, such evidence would be barred under a fair reading of the statute.  "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following:  unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence".  (*See* Rule 403.)  Government recordings of conversations in which defendant identifies membership in or association with, or negative views of any of the following, has no probative value, any probative value is "substantially outweighed by a danger of unfair prejudice, confusing the issues or misleading the jury", and should be precluded:

· membership or inclinations toward Ku Klux Klan (*see* United States v. Padilla, 869 F.2d 372, cert denied 492 U.S. 909 (1989));

- views of political government leaders and organizations including, but not limited to, President Barack Obama, Governor Andrew Cuomo, Hillary Clinton;

- views on banking system, the Federal Reserve, and those operating both

### POINT V

### DEFENDANT REQUESTS THE CONDUCT OF A SUPPRESSION HEARING UNDER MASSIAH v. UNITED STATES, 377 U.S. 201; 84 S. Ct. 1199 (1964) AND SUPPRESSION OF CLAIMED JAILHOUSE INFORMANT TESTIMONY AS A VIOLATION OF DEFENDANT'S SIXTH AMENDMENT RIGHT TO COUNSEL

After defendant's arraignment with counsel and remand to custody on June 19, 2013, he was incarcerated at the Warren County correctional facility.  On March 20, 2014, the government provided defendant's counsel a FBI 302 averring, in part, that after attachment of Crawford's Sixth Amendment counsel, defendant made a number of admissions to an unidentified inmate at the Warren County Correctional Facility.  [*See Appendix A at pages 1-4*]

Those claimed admissions were instigated by the inmate, upon belief, with the support of someone in government, either directly to the inmate or through the inmate's counsel. The government has not identified the claimed jailhouse informant.  Crawford was approached by numerous inmates after his Sixth Amendment right to counsel attached, all peppering him with questions.  The defendant did not know any of the inmates beforehand, and the inmates who approached and questioned the defendant were persistent.[5]

As defendant's counsel, our investigation believes that the inmate was one of several incarcerated for serious crimes, and that his attorney is one who regularly works

---

[5] Crawford is not able to supply an affidavit because he cannot identify from the 302 the confidential informant and therefore cannot provide details of any communication.

on criminal cases with the federal government, and who has in the past worked with the federal government as a bridge to informants.

In <u>Massiah v. United States</u>, 377 U.S. 201 (1964), a defendant was questioned by a confidential informant working with the government after he had been arraigned. The Supreme Court held that the inmate's Sixth Amendment counsel had attached and precluded the admissibility of the statements made to the informant, finding:

> We hold that the petitioner was denied the basic protections of that guarantee when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel.

<u>Massiah</u> was extended to jailhouse informants in <u>United States v. Henry</u>, 447 U.S. 264 (1980). In <u>Henry</u>, a federal agent told an informant "to be alert to any statements made by federal prisoners, but not to initiate any conversations or question Henry regarding [his alleged crimes]". The informant testified at trial that he had "an opportunity to have some conversations with Henry while he was in the jail", and that Henry had made admissions.

The Supreme Court barred the admissions under the Sixth Amendment:

> When the accused is in the company of a fellow inmate who is acting by prearrangement as a Government agent, the same cannot be said. Conversation stimulated in such circumstances may elicit information that an accused would not intentionally reveal to persons known to be Government agents. Indeed, the <u>Massiah</u> Court noted that if the Sixth Amendment "is to have any efficacy it must apply to indirect and surreptitious interrogations as well as those conducted in the jailhouse." The Court pointedly observed that <u>Massiah</u> was more seriously imposed upon because he did not know that his co-defendant was a Government agent.

The face of the subject 302 is both telling and troubling. This inmate, who never before knew Crawford, claims through casual conversations to have obtained a

significant amount of information and detail from Crawford, and to be able to recount the information in a substantially organized presentation to the New York State Police and FBI agents.  It is also noteworthy that the New York State police had communications with the informant according to the face of the 302.

Defendant requests that the Court conduct a <u>Massiah</u> hearing to ascertain the government's role in the acts of the jailhouse informant, which would include the informant, his attorney, and the New York State police officer who arranged the meeting, recounted in the 302 about the timing of their communications with one another with respect to the claimed statements obtained from defendant.  Under <u>Massiah</u>/<u>Henry</u> case law, as little as a conversation with the defendant encouraging the inmate to "be alert to any statements"[6] (<u>Henry</u>, <u>id</u>.) from an inmate is sufficient for a Sixth Amendment violation and suppression, and the same principle would apply to a comparable conversation by the government with the informant's counsel, even if the informant's counsel initiated the conversation.

## POINT VI

**DEFENDANT REQUESTS THAT THE GOVERNMENT BE DIRECTED TO PRODUCE ALL EVIDENCE AS <u>BRADY</u> MATERIAL RELATED TO A DEFENSE OF ENTRAPMENT INCLUDING ALL TEXT MESSAGES AND EMAIL EXCHANGES AMONG AND BETWEEN THE UNDERCOVERS PERTAINING TO CRAWFORD**

What is clear from the discovery provided by the government, when the government agents first had contact with Crawford, he was not committing any crimes. Through involvement with then undercovers over fourteen (14) months of meetings with Crawford, Crawford was charged. That conduct raises the specter of the defense of

---

[6]  In <u>Henry</u>, the inmate was paid money *after* he gave information.  It is unknown if this inmate was paid in money, considerations at the jail, or considerations in his pending crimes or sentencing.

entrapment, and when the defendant establishes inducement, creates a burden of proving predisposition on the part of the government.  United States v. Bala, 236 F.3d 87, 97 (2nd Cir., 2000).

Clearly, the government must disclose exculpatory evidence.  Brady, 373 U.S. at 87.  And, it is the Government's duty in the first instance to determine whether evidence is exculpatory and, if so, disclose it. See Kyles v. Whitley, 514 U.S. 419, 439 (1995). With entrapment, the first issue that will be determined is whether the government induced Crawford to commit an offense, which necessarily brings focus on the government's conduct in inducing Crawford to commit a crime.  *See* United States v. Mayo, 705 F.2d 62, 67 (2nd Cir., 1983).  These relevant email and text communications are not just communications by undercovers with Crawford, but among the undercovers and with their superiors who would be providing direction to undercovers on how to move Crawford, or, in other words, induce his conduct.

It is apparent from the recordings[7] that the undercovers were regularly encouraging Crawford, giving him guidance and ideas and repeating patriotic, religious and family themes that were clearly moving to Crawford. The factual issue arises as to whether those actions and communications by the government were being orchestrated in a way to induce Crawford to proceed.

In viewing the video surveillance evidence, there are multiple times when the undercovers are communicating on cell phones during periods of time they are in the presence of Crawford.  Those are obvious.  These communications – whether by email or text - would predictably involve discussing the activities of the agents, directions to

---

[7] The video discovery provided by the government is on a hard drive in which most of the recordings are made incapable of copying.  The undersigned requests permission to show to the court video segments at hearing to support the arguments herein where the arguments are based upon recordings.

the agents, and likely directions on how to convince Crawford to move forward in the possible commission of the crimes.

There would also be communications of the same type, plus memoranda, among the undercovers and superiors on strategies to move Crawford along toward committing crimes.  Whether this evidence is exculpatory is not immediately apparent because we have not been shown the texts, emails and memoranda.  Kyles v. Whitley, 514 U.S. 419, 439 (1995).  This results from the fact that "the character of a piece of evidence as favorable will often turn on the context of the existing or potential evidentiary record."  Id. The subject matter of those exchanges is relevant to determine whether the strategy of the government agents was to guide Crawford to commit criminal acts for purposes of his arrest.  For example, on the date of his arrest, the video shows multiple communications ongoing between those government agents in the room with Crawford, and only after Crawford informs the agents that "There is this thing called leagues, and I am not in this one" and refuses to engage in actions pertaining to the equipment provided by the government is he arrested.  [*Appendix B*]

## POINT VII

**DEFENDANT REQUESTS THAT THE GOVERNMENT BE DIRECTED TO PROVIDE ITEMS OF DISCOVERY NOT SPECIFICALLY INCLUDED IN THE GOVERNMENT'S DISCLOSURE**

The government has made several disclosures of discovery materials in connection with this matter.  None of the disclosures were Bates-stamped and thus it is difficult to identify to the court specific omissions in the discovery.  Notwithstanding, upon the review of the discovery materials shows that the government May 6, 2013, May 5, 2013 and May 24, 2013 FD-302s at pages 5-16 of Appendix A [*Bates-stamped*

*by defendant as 7092-7097 and 7104-7108*] show references to the following recorded

telephone calls with Crawford in which there does not appear in the audio records a tape

recording of the calls in these discovery:

| Call Date | Session Number | Bates-stamped page |
| --- | --- | --- |
| 12/18/2012 | 14 | 7092 |
| 1/09/2013 | 1687 | 7092 |
| 1/11/2013 | 1907 | 7092 |
| 2/15/2013 | 4146 | 7092 |
| 3/20/2013 | 6234 | 7093 |
| 3/20/2013 | 6244 | 7093 |
| 4/30/2013 | 9480 | 7093 |
| 1/28/2013 | 12 | 7095 |
| 1/28/2013 | 19 | 7095 |
| 2/06/2013 | 90 | 7096 |
| 4/15/2013 | 472 | 7097 |
| 5/16/2013 | 11,100 | 7104 |
| 5/17/2013 | 11,235 | 7104 |
| 5/17/2013 | 11,236 | 7104 |
| 5/19/2013 | 11,470 | 7104 |

| Call Date | Session Number | Bates-stamped page |
|-----------|----------------|--------------------|
| 5/20/2013 | 703 | 7108 |

Defendant requests that the government be directed to produce the recordings that appear missing from the discovery response.

In addition, there is a meeting in the discovery where an undercover quizzes Crawford about Muslim targets.  That conversation was preceded by others on the phone and in person where that topic was discussed that were not provided and would have preceded that particular recording over the prior ninety days.  Those prior recordings do not appear to be included in the discovery and would constitute Brady material related to inducement.

## CONCLUSION

Defendant Crawford respectfully requests that the court issue an order dismissing Counts One and Two of the indictment, precluding the government from introducing evidence of or referencing in any manner defendant's relationship in the Ku Klux Klan and any reference by him to or opinions of government official or bodies, directing the conduct of a <u>Massiah</u> hearing, directing that the government produce all communications by and among the undercover informants and uncover federal agents in connection with all actions pertaining to Crawford, and directing that the government provide items of discovery not specifically included in the government's disclosure.

Dated:  March 30, 2015

Yours, etc.,

LUIBRAND LAW FIRM, PLLC

Kevin A. Luibrand, Esq.
Federal Bar Roll No. 102083
Attorneys for Defendant
Office and P.O. Address:
950 New Loudon Road
Latham, New York 12210
Telephone:  (518) 783-1100
Facsimile:  (518) 783-1901
E-mail:  KLuibrand@LuibrandLaw.com