IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

**UNITED STATES OF AMERICA,**

**v.**

**Criminal Action No.**
**1:14-CR-30 (GLS)**

**GLENDON SCOTT CRAWFORD,**

       **Defendant.**

_____

---

## UNITED STATES' TRIAL MEMORANDUM

---

Dated:  July 28, 2015

Respectfully submitted,

RICHARD S. HARTUNIAN
United States Attorney


/s/
By:   Stephen C. Green
Assistant U.S. Attorney
Bar Roll No. 507767


/s/
Richard D. Belliss
Assistant U.S. Attorney
Bar Roll No. 515295

TABLE OF CONTENTS

A.      STATEMENT OF THE CASE ..................................................................1

B.      STATEMENT OF FACTS ........................................................................1

C.      STATEMENT OF THE LAW ...................................................................5

    1.   The Charged Offenses and Their Elements..........................................5

        a.   Count One ....................................................................................5

        b.   Count Two ....................................................................................6

        c.   Count Three .................................................................................7

    2.   Applicable Definitions .........................................................................8

        a.   Count Two – Definition of "weapon of mass destruction." ...................8

        b.   Count Three – Definition of "Federal crime of violence." ....................8

        c.   Count Three – Definition of "weapon of mass destruction" for 18
            U.S.C. § 842(p). ..........................................................................8

    3.   Relevant Legal Issues..........................................................................8

        a.   Attempts .......................................................................................8

        b.   Conspiracy ................................................................................10

        c.   Investigations Involving Undercover Officers.......................................12

        d.   Impossibility .............................................................................13

        e.   The Threshold Requirements To Instructing A Jury On The
            Affirmative Defense of Entrapment ...................................................14

D.      EVIDENTIARY  ISSUES .......................................................................18

    1.   Audio Recordings and Transcripts .....................................................18

    2.   Statements of Co-Conspirators ...........................................................21

    3.   Testimony Concerning the Sum and Substance of Events and
        Conversations .....................................................................................23

4.  Leading Questions ................................................................................. 23

5.  Chain of Custody .................................................................................. 24

6.  Expert Testimony ................................................................................... 25

7.  Jury Viewing of Crawford's X-Ray Device ....................................... 26

8.  Presentation of Witnesses and the Recalling of Government Witnesses to the Stand ................................................................................................ 27

9.  Agents Summarizing the Multiple Hours of Audio and Video Recordings Capturing the Defendant Discussing His Plan is Admissible Under Rule 1006 of the Federal Rules of Evidence .................................................... 27

E.   MOTIONS IN LIMINE .................................................................................. 28

F.   CONCLUSION .............................................................................................. 29

A.      STATEMENT OF THE CASE

On January 16, 2014, defendant Glendon Scott Crawford ("Crawford") was charged in an indictment with the following three offenses: one count of attempting to produce, construct, acquire, transfer, receive, possess, and use a device capable of and designed and intended to release radiation and radioactivity at a level dangerous to human life, in violation of 18 U.S.C. § 2332h(a) and (c)(1) (Count 1); one count of conspiracy to use a weapon of mass destruction, in violation of 18 U.S.C. § 2332a(a)(2)(C) (Count 2); and distributing information relating to weapons of mass destruction, in violation of Title 18, United States Code, § 842(p)(2)(A).  The Indictment also contains a forfeiture allegation, seeking forfeiture of cell phones, maps and diagrams, wireless radio devices used by the defendant to carry out his criminal activity.  The case is scheduled for trial before this Court commencing on August 17, 2015.

B.      STATEMENT OF FACTS

The criminal conduct that forms the basis for the three counts of the Indictment is defendant Crawford's long-term and persistently pursued plan to produce, construct, acquire, transfer, receive, possess, and use a device capable of and intended to endanger human life through the release of radiation.  Specifically, the defendant sought, researched, and ultimately acquired a powerful, industrial grade, x-ray system that he planned to modify so the device could be activated from a distant, remote location, all for the purpose of causing serious injury and death to human beings he deemed undesirable.  The x-ray system, when completed and weaponized according to Crawford's plan, was to be inserted into and transported to target locations inside a commercial delivery truck.  A central feature of Crawford's completed x-ray device was that its human targets, and those around them, would be exposed to dangerous and lethal doses of x-ray radiation without being aware of the exposure, the harmful effects of which

would likely not become apparent until days afterwards.  Crawford shared his plan with a former colleague and skilled engineer, Eric Feight ("Feight"), who became his co-conspirator, and assisted him in designing, identifying and acquiring the parts for, building, and eventually successfully testing and delivering to Crawford, remote initiation devices.   Those remote initiation devices were, according to Crawford's plan, to be integrated into the control panel of the x-ray device to allow the x-ray device to be operated from a distance.  Crawford had just completed assembling an industrial x-ray device, and had received and was in possession of the remote initiation devices, when he was arrested.  Crawford, in intercepted communications, has described his intention to provide a functioning radiation emitting device to individuals he believes will use it to kill or injure people he deems undesirable (he specifically identified Muslims and other individuals/groups, and researched and identified targets and locations in the Albany area for the first uses of his radiation emitting device).

By his own words, long before he was known to local or federal law enforcement, Crawford began actively soliciting financing for his plan to acquire a sufficiently powerful industrial x-ray device to carry out his scheme.  In April of 2012, Crawford approached two Albany-area Jewish organizations for the same purpose, stating that he could assist in providing a weapon that would kill the enemies of Israel in their sleep, if they would financially support him.  Neither organization provided the requested financing, but they did contact local law enforcement.  And the investigation began.

 After local law enforcement made Crawford's Albany-area solicitations known to the FBI, the FBI was concerned about his activities and identified a Confidential Human Source ("CHS") who could contact Crawford and find out what he was up to.  Approximately six weeks after Crawford's solicitation of the two Albany-area Jewish organizations, a CHS contacted

Crawford.  Crawford described his x-ray radiation device scheme to the CHS (in a consensually-recorded conversation).  Once it was ascertained that Crawford was serious about his scheme and that his radiation emitting device concept was indeed viable, an FBI undercover employee (hereafter "UCE #1") was introduced to Crawford by the CHS.  That combination – Crawford, the CHS and UCE #1 – formed the "first branch" of the investigation. Crawford met with the CHS and UCE #1 concerning his scheme and Crawford's ongoing pursuit of an x-ray radiation device to kill or harm human targets deemed undesirable, and those meetings were consensually recorded.

Separately, in the summer of 2012, Crawford researched, identified, and contacted a ranking member of the Ku Klux Klan ("KKK"), who then resided in North Carolina, and asked to meet with him. He did this without any government role, direction, or advance knowledge. This individual approached the FBI and told them Crawford had contacted him.  In August of 2012, Crawford traveled in his car from his home near Albany, NY to North Carolina to meet with this ranking KKK member (hereafter identified as the cooperating witness, or "CW"). Crawford did that research, made that contact, and drove that distance to pitch his radiation device plan to this official of the KKK, which he did when they met in North Carolina.  Part of Crawford's pitch to the CW was to have the CW contact other officials in the KKK to obtain financial support from the KKK for Crawford's radiation emitting device plot.  That meeting in North Carolina was recorded.  This CW also told Crawford he (the CW) had contacted other officials of the KKK and shared with them Crawford's plan and request for financing, as Crawford had requested him to do.  Crawford asked the CW to set up a meeting with the KKK people the CW had spoken to.  The CW complied with Crawford's request.

In early October of 2012, Crawford drove his car from his home in the Albany, NY area to Greensboro, North Carolina to meet with the CW and two individuals the CW introduced to Crawford as Southern businessmen of means who were known to the CW and associated with the KKK.   The two individuals assumed those roles, but in reality were FBI undercover employees (hereafter identified as UCEs #2 and #3).   This second group – composed of Crawford, the CW, and UCEs #2 and #3 – comprised the "second branch" of the investigation. At the meeting in North Carolina, Crawford described to these individuals he believed to be KKK officials his desire and efforts to acquire, modify, and weaponize an industrial radiation emitting device to be used to kill individuals deemed to be undesirable.   Crawford laid out his plan, his extensive research of the science and technical concepts utilized in the desired device, his plan to design and build a remote initiation device to control the radiation emitting device, and discussed concerns about avoiding getting caught.   Crawford again sought financial backing for his radiation device.   Both the first and second branches assisted Crawford with minor amounts of money to obtain parts. From that time forward to May of 2013, Crawford steadily worked to design and build his planned remote initiation device to remotely turn on and off his radiation emitting device, with the assistance of his co-conspirator Feight.

In December of 2012, the United States applied for and received judicial authorization, pursuant to Title III, to intercept wire and electronic communications over Crawford's cellular telephone. Crawford later acquired a second cell phone (this one a pre-paid TracFone), which he advised the CW and the UCEs #2 and #3 was to be used exclusively for communications regarding his radiation emitting device scheme.   Crawford's communications concerning his radiation plot were also intercepted over this phone, pursuant to judicial authorization again obtained pursuant to Title III.

On May 20, 2013, Crawford successfully tested and demonstrated the remote initiation devices his co-conspirator Feight had designed and built with Crawford's assistance. Following that successful test and demonstration of Crawford's desire and ability to carry out his plot, the individuals Crawford believed to be businessmen associated with the KKK provided Crawford access to an industrial x-ray radiation device that Crawford had requested.  Shortly thereafter, on June 18, 2013, Crawford received, possessed, acquired and assembled at an Albany area garage a radiation emitting device he intended to be used on human targets that he believed was capable of emitting radiation at levels harmful to humans (but had been rendered safe in advance to avoid harm to him or the public).  After looking at the radiation device's control panel and bringing to it his completed and working remote initiation device he had brought with him to the garage, Crawford was arrested in that garage near Albany, NY.

C.      STATEMENT OF THE LAW

      1.      The Charged Offenses and Their Elements

            a.      Count One

Count One of the Indictment charges the defendant with attempting to produce, construct, acquire, transfer, receive, possess, and use a radiological dispersal device, in violation of Title 18, United States Code, Section 2332h(a) and (c)(1).  Count One reads in relevant part:

> From at least in or about April 2012, to on or about June 18, 2013, in Albany, Rensselaer, Saratoga, and Schenectady Counties in the Northern District of New York, and elsewhere, in an offense occurring in and affecting interstate and foreign commerce, defendant GLENDON SCOTT CRAWFORD, without lawful authority, did knowingly attempt to produce, construct, acquire, transfer, receive, possess, and use a device capable of and designed and intended to endanger human life through the release of radiation and radioactivity, specifically an industrial-grade x-ray system that the defendant planned to modify so that it could be activated from a remote location, all for the purpose of causing serious injury and death to human beings, in violation of Title 18, United States Code, Section 2332h(a) & (c)(1).

*Elements of the Offense*

To prove a violation of Section 2332h(a), the government must establish each of the following elements beyond a reasonable doubt:

First, the Defendant attempted to produce, construct, acquire, transfer, receive, possess, or use a device, specifically an industrial-grade x-ray system that the defendant planned to modify so that it could be activated from a remote location;

Second, the device was capable of and designed, or intended, to endanger human life through the release of radiation or radioactivity;

Third, the Defendant's activity occurred in or affected interstate commerce.

Title 18, United States Code, Section 2332h(a).

        b.      Count Two

Count Two of the Indictment charges the defendant with conspiring to use a weapon of mass destruction, in violation of  Title 18, United States Code, Section 2332a(a)(2)(C).  Count Two reads in relevant part as follows:

From in or about the summer of 2012, to on or about June 18, 2013, in Albany, Rensselaer, Saratoga, and Schenectady Counties in the Northern District of New York, and elsewhere, defendant GLENDON SCOTT CRAWFORD and others, without lawful authority, conspired to use a weapon of mass destruction, specifically a modified industrial-grade x-ray system designed to release radiation at a level dangerous to human life, against persons and property within the United States, and traveled in interstate commerce in furtherance of such offense, in violation of Title 18, United States Code, Section 2332a(a)(2)(C).

*Elements of the Offense*

To prove a violation of Section 2332a(a)(2)(C), the government must establish each of the following elements beyond a reasonable doubt:

First, that there was a conspiracy among two or more persons to use a weapon of mass destruction against persons or property within the United States;

Second, that the defendant became a member of that conspiracy with knowledge of its criminal goal and intending by his actions to help it succeed; and

Third, the defendant traveled in interstate commerce in furtherance of this offense.

6

Title 18, United States Code, Section 2332a(a)(2)(C).

   c.  Count Three

Count Three of the Indictment charges the Defendant with distributing information with respect to a weapon of mass destruction, in violation of 18 U.S.C. § 842(p)(2)(A).  Count Three reads in relevant part as follows:

> Beginning in or about April of 2012, and continuing through June 18, 2013, in Albany, Saratoga, and Schenectady Counties in the Northern District of New York, and elsewhere, defendant GLENDON SCOTT CRAWFORD did knowingly teach and demonstrate the making and use of a weapon of mass destruction, and did knowingly distribute information pertaining to, in whole or in part, the manufacture and use of a weapon of mass destruction, with the intent that the teaching, demonstration, and information be used for, and in furtherance of, an activity that constitutes a Federal crime of violence, including a violation of Title 18, United States Code, Section 2332a (use of weapons of mass destruction), all in violation of Title 18, United States Code, Section 842(p)(2)(A).

*Elements of the Offense*

To meet its burden of proof, the Government must prove beyond a reasonable doubt each of the following elements:

First, the defendant knowingly taught or demonstrated how to make or use a weapon of mass destruction, specifically a modified industrial-grade x-ray system designed to release radiation at a level dangerous to human life, or that the defendant knowingly distributed any information related, in whole or in part, to the manufacturing or use of a weapon of mass destruction (a modified industrial-grade x-ray system designed to release radiation at a level dangerous to human life);

Second, the defendant intended that his teaching or demonstration, or the information he distributed, be used for, or in furtherance of, an activity that constitutes a Federal crime of violence.

Title 18, United States Code, Section 842(p)(2)(A).

2.      Applicable Definitions

      a.      Count Two – Definition of "weapon of mass destruction."

Title 18, United States Code, Section 2332a provides its own definition of "weapon of mass destruction," in subsection 2332a(c), entitled, "Definitions."  Section 2332a(c)(2) provides, in relevant parts, that: "the term 'weapon of mass destruction' means – (D) any weapon that is designed to release radiation at a  level dangerous to human life; ..."

Title 18, United States Code, Section 2332a.

      b.      Count Three – Definition of "Federal crime of violence."

The term "crime of violence" means –

(a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another; or

(b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the  offense.

      c.      Count Three – Definition of "weapon of mass destruction" for 18 U.S.C. § 842(p).

Title 18, United States Code, Section 842(p), at subsection (1)(C), defines "weapon of mass destruction"  as having the "same meaning as in section 2332a(c)(2)."  As set forth above, Section 2332a(c)(2), in relevant part, defines "weapon of mass destruction" as any weapon that is designed to release radiation or radioactivity at a level dangerous to human life.

3.      Relevant Legal Issues.

      a.      Attempts

A conviction for attempt requires proof that a defendant (a) had the intent to commit the object crime and (b) engaged in conduct amounting to a substantial step toward its commission.

*United States v. Farhane*, 634 F.3d 127, 145 (2d Cir. 2011); *United States v. Yousef*, 327 F.3d 56, 134 (2d Cir. 2003).

To prove the crime of attempt to produce, construct, acquire, transfer, receive, possess, or use a device capable of and designed, or intended, to endanger human life through the release radiation, as charged in Count One of the Indictment, the government must prove the following beyond a reasonable doubt:

-first, that Crawford intended to commit the crime of producing, constructing, acquiring, transferring, receiving, possessing, or using a device capable of and designed, or intended, to endanger human life through the release of radiation; and

-second, that Crawford engaged in a purposeful act that, under the circumstances as he believed them to be, amounted to a substantial step toward the commission of that crime and strongly corroborated his criminal intent.

A "substantial step" is an act in furtherance of the criminal scheme, and conduct "planned to culminate" in the crime the defendant attempted. *Farhane, supra*, at 147 (*citing United States v. Ivic*, 700 F.2d 51, 66 (2d Cir. 1983). A "substantial step" must be something more than mere preparation, but less than the last act necessary before the substantive crime is completed. The "substantial step" itself may prove the intent to commit the crime, but only if it unequivocally demonstrates such an intent. *Farhane, supra,* at 147-148. Here, Count One charges an attempt to violate Section 2332h(a) and (c)(1), which criminalize attempts to "produce, construct, otherwise acquire, transfer directly or indirectly, receive, possess, import, export, or use, or possess and threaten to use" a device capable of and designed or intended to endanger human life through the release of radiation. The evidence will show that the defendant not only made agreements to acquire such a device, he succeeded in most of the proscribed activities listed in Section 2332h.

A defendant may be convicted of attempt even if the crime is completed because an attempt is a lesser included offense of the substantive crime and the facts that would support the substantive crime also support the attempt charge. *Ljutica v. Holder*, 588 F.3d 119, 125 (2d Cir. 2009).

          b.     Conspiracy

Count Two of the Indictment charges the defendant with conspiracy to use a weapon of mass destruction. The elements of that charged offense are set forth above.

A conspiracy is a combination or agreement of two or more persons to join together in an attempt to accomplish some unlawful purpose. Conspiracy is a separate and distinct crime from the substantive offense which is the object of the conspiracy. *United States v. Pickney*, 85 F.3d 4, 8 (2d Cir. 1996). "It is the unlawful agreement itself which constitutes the crime." *United States v. Martino*, 759 F.2d 998, 1004 (2d Cir. 1985); *see Iannelli v. United States*, 420 U.S. 770, 770 n.10 (1975). The government does not have to prove the substantive offense in order to prove the conspiracy. *Pickney*, 85 F.3d at 8. The central concern in a conspiracy case is whether the defendant agreed with at least one other person to commit the target offense. *United States v. Rosa*, 17 F.3d 1531, 1544 (2d Cir. 1994).

The government may prove the existence of a conspiracy and a defendant's knowing participation in it entirely through circumstantial evidence. *Glasser v. United States*, 315 U.S. 60, 80 (1942); *United States v. Huezo*, 546 F.3d 174, 180 (2d Cir. 2008). A conspiracy is "by its very nature a secretive operation." *United States v. Provenzano*, 615 F.2d 37, 45 (2d Cir. 1980). Thus, the informal agreement present in most conspiracies must frequently be proven by circumstantial evidence. *Martino*, 759 F.2d at 1002-04. Such evidence may include "a defendant's association with conspirators in furtherance of the conspiracy; his presence at critical stages of the conspiracy that cannot be explained by happenstance or his possession of items that

are of essential significance to the conspiracy." *United States v. Anderson*, 747 F.3d 51, 60 (2d Cir. 2014). Seemingly innocent acts, viewed in light of all surrounding circumstances, may justify an inference of participation in it. *United States v. Mariani*, 725 F.2d 862, 865-66 (2d Cir. 1984). To be sufficient, such evidence "need not have excluded every possible hypothesis of innocence." *United States v. Soto,* 716 F.2d 989, 993 (2d Cir. 1983).

Each conspirator need not know all the details of the conspiracy, the identity or number of his co-conspirators, as long as that conspirator understands the general nature of the conspiracy. *Rosa*, 17 F.3d at 1543. The government must prove that the defendant knew of the conspiracy and joined it with the intent to commit the crime or crimes which were the object of the conspiracy. *Ceballos*, 340 F.3d at 123 (holding that the defendant must have the affirmative intent to make the conspiracy succeed). For Count 2, the underlying substantive offense is the use of a weapon of mass destruction, specifically a modified industrial-grade x-ray system designed to release radiation at a level dangerous to human life. Therefore, the government must establish that the defendant agreed with one or more persons to use a weapon of mass destruction against persons or property within the United States, that he became a member of that conspiracy with knowledge of its criminal goal and intending by his actions to help it succeed, and that he traveled in interstate commerce in furtherance of this offense. Title 18, United States Code, Section 2332a(a)(2)(C).

Even a single act may suffice to establish membership in a conspiracy if it justifies an inference of the requisite knowledge. *Anderson*, 747 F.3d at 61. A defendant once found to be a member of a conspiracy, whatever his level of participation, may be criminally responsible for acts of which he is unaware by persons whose existence is unknown to him, if done as part of the conspiratorial design. *United States v. Cirillo*, 468 F.2d 1233, 1239 (2d Cir. 1972). Evidence of

11

the entire scope of the conspiracy is admissible against each co-conspirator.  *United States v. Nersesian*, 824 F.2d 1294, 1304 (2d Cir. 1987).

         c.       Investigations Involving Undercover Officers

Crawford conceived and researched his plan to acquire and modify for use as a weapon an industrial-grade x-ray device to use on human targets, and actively solicited funds to acquire such a device, well before law enforcement was even aware of him. Once law enforcement had been informed of Crawford's personal attempts to solicit financial support in the local area for his radiation device plot, however, efforts were made to find out what he was up to and how dangerous his activities were.  To obtain knowledge of Crawford's plans and activities regarding his x-ray device scheme, law enforcement authorities thereafter employed sources, undercover investigations, and a cooperating witness. Law enforcement authorities often use undercover investigations and informants in attempting to enforce the law. *United States v. Malachowski*, 415 F. App'x 307, 310 (2d Cir. 2011).  *United States v. Malachowski*, 415 F. App'x 307, 310 (2d Cir. 2011).  Such methods are a normal and sometimes necessary part of effective law enforcement.  *United States v. Borrero*, No. 13-CR-58 KBF, 2014 WL 5493241, at *2 (S.D.N.Y. Oct. 30, 2014) (citing *United States v. Jenkins,* 876 F.2d 1085, 1087 (2d Cir. 1989) (per curiam)); *United States v. Harvey,* 991 F.2d 981, 997 (2d Cir. 1993) (quoting *Sorrells v. United States*, 287 U.S. 435, 441 (1932)).  The Second Circuit has held that "government creation of the opportunity to commit an offense, even to the point of supplying defendants with materials essential to commit crimes, does not exceed due process limits."  *United States v. Cromitie*, 727 F.3d 194, 219 (2d Cir. 2013) (citing *United States v. Russell*, 411 U.S. 423, 431-32 (1973)).  It is proper for a government agent to pretend to be someone else and to offer either directly or through an informer or other decoy to engage in an unlawful transaction. *See United States v.*

12

*Pool*, 660 F.2d 547, 557-58 (5th Cir. 1981); *see also United States v. Allibhai*, 939 F.2d 244, 251 (5th Cir. 1991).

        d.     Impossibility

      In an undercover investigation where a defendant intends to acquire a weapon of mass destruction but law enforcement is able to render safe such a device or weapon before the defendant receives and uses it, as is the case here, it is impossible for the object of the conspiracy to be fully realized, or for the substantive crime to be completed.  Nevertheless, impossibility is not a defense to the charges. The elements of knowledge and intent are satisfied if, under the circumstances as the defendant believed them to be, the defendant agreed to, or took a substantial step planned to culminate in, the crime charged in the indictment.  *United States v. Williams*, 553 U.S. 285, 300 (2008) (impossibility no defense to attempt); *United States v. Weisser*, 417 F.3d 336, 352 (2d Cir. 2005) (same); *United States v. Wallace,* 85 F.3d 1063, 1068 (2d Cir. 1996) (impossibility no defense to conspiracy); *United States v. Mann,* 513 F.2d 974, 976 (2d Cir. 1975) (impossibility no defense to attempt); *see United States v. Rodriguez,* 360 F.3d 949, 957 (9th Cir. 2004) (impossibility no defense to conspiracy arising out of government sting).  As stated in a similar case where a bomb sent to a United States Attorney's Office was inoperable, "[t]here is no reason to exonerate a person who has demonstrated a willingness to commit a criminal act, but was unable to complete the dastardly deed because of an unknown outside circumstance." *United States v. Hamrick*, 995 F.2d 1267, 1273 (4th Cir. 1993) *on reh'g en banc*, 43 F.3d 877 (4th Cir. 1995).  Because the x-ray device here had been rendered safe before the defendant acquired, received, and possessed it, a circumstance entirely unknown to the defendant, it became impossible for defendant to carry out his plan with the device he acquired. This fact does not prevent conviction, however, on either Count One, the attempt to engage in conduct violation of 18 U.S.C. § 2332h(a) and (c)(1) or Count Two, the conspiracy to use a

weapon of mass destruction charge (in violation of 18 U.S.C. § 2332a(a)(2)(C).  *Williams*, 552 U.S. at 300; *United States v. Romero-Ramirez*, 125 F.3d 845 (2d Cir. 1997) (quoting *United States v. Hendrickson,* 26 F.3d 321, 337 (2d Cir. 1994).  The Government expects that its evidence at trial will permit the jury to find that the defendant took a substantial step (or multiple substantial steps) to commit the offense charged in Count One and participated in a conspiracy with at least one other person to commit the offense charged in Count Two.

> e.   The Threshold Requirements To Instructing A Jury On The Affirmative Defense of Entrapment

The Second Circuit has stated that the test for determining if a jury should be instructed on entrapment is "… if inducement has been shown, entrapment must be submitted to the jury if there exists a genuine issue of fact concerning the accused's propensity to commit the crime." *United States v. Mayo*, 705 F.2d 62, 68 (2d Cir. 1983).  Entrapment is an affirmative defense that has two related elements: government inducement of the crime; and a lack of predisposition on the part of the defendant to engage in the criminal conduct.  *Mathews v. United States,* 485 U.S. 58, 108 S. Ct. 883 (1988).  Predisposition, "the principal element in the defense of entrapment," focuses upon whether the defendant was an "unwary innocent" or, instead, an "unwary criminal" who readily availed himself of the opportunity to perpetrate the crime.  *Id. at* 886 (internal quotations and citations omitted), (quoting *Sorrells v. United States,* 287 U.S. 435, 53, 53 S. Ct. 210 (1932), *United States v. Russell*, 411 U.S. 423, 433 (1973), and *Sherman v. United States,* 356 U.S. 369, 372 (1958)).  Here, the Government expects that evidence in its case in chief will make manifest that the defendant had formed his plan to acquire and modify an industrial-grade x-ray device to be used to kill human targets, and had taken the substantial step of soliciting funds to carry out his plan, well before law enforcement ever heard of him or his plan. Accordingly, the defendant will not be able to establish inducement, as a threshold component of

the affirmative defense, nor refute that he was not only "predisposed" to commit charged offenses but had in fact begun committing them before any engagement with law enforcement.

Here, based in part on claims and arguments presented in the defendant's prior motion to dismiss the Indictment, the Government anticipates that the defense may attempt to inject at trial the notion that Crawford was the victim of entrapment by government agents.  The two related elements of a defense of entrapment, as noted above, are: 1) that the government induced the defendant to commit the crime; and 2) that the defendant was not predisposed to commit the crime.  *Mathews, supra; United States v. Cromitie*, 727 F.3d 194, 204 (2d Cir. 2013) *cert. denied*, 135 S. Ct. 53, 190 L. Ed. 2d 55 (2014) and *cert. denied sub nom. Williams v. United States*, 135 S. Ct. 54, 190 L. Ed. 2d 55 (2014) and *cert. denied sub nom. Payen v. United States*, 135 S. Ct. 54, 190 L. Ed. 2d 55 (2014) and *cert. denied sub nom. Williams v. United States*, 135 S. Ct. 56, 190 L. Ed. 2d 55 (2014); citing *Mathews v. United States*, 485 U.S. 58, 63, 108 S. Ct. 883, 99 L.Ed.2d 54 (1988).  If a defendant presents credible evidence of inducement, the Government must prove beyond a reasonable doubt that the defendant was predisposed to commit the crime.  *United States v. Salerno*, 66 F.3d 544, 547 (2d Cir. 1995) (citing *Jacobson v. United States*, 503 U.S. 540, 549 (1992)).  If the defense gets to that point, the key question then is whether the criminal design originated with the defendant or the government agents. *United States v. Damblu*, 134 F.3d 490, 495 (2d Cir. 1998) (citing *United States v. Russell*, 411 U.S. 423, 433 (1973)).

Here, the Government's evidence at trial will show that the defendant was not induced to commit the charged offenses, but rather had embarked on his plan to engage in conduct in violation of charges in the indictment before law enforcement knew of him or his plan. Inducement is defined as "soliciting, proposing, initiating, broaching or suggesting the

commission of the offence charged." *United States v. Henry*, 417 F.2d 267, 269 (2d Cir. 1969) (quoting *United States v. Sherman*, 200 F.2d 880, 883 (2d Cir. 1952)). The defendant's burden of establishing inducement is "relatively slight," while the government's burden to show propensity to commit the crime is "more difficult." *Id.* at 269. Even though the burden on a defendant is "relatively slight," the inducement element should not be hollow and cannot be satisfied by simply pointing to the use of undercover agents. *United States v. Balkany*, 468 F. App'x 49, 51-52 (2d Cir. 2012) (citing *Brand,* 467 F.3d 179, 190 (2d Cir. 2006)). The focus of the inducement component is the government agents' conduct. *Cromitie* 727 F. 3d at 210.

Evidence in the Government's case in chief will show that the Government agents' conduct does not establish inducement. As noted above, the government was only made aware of Crawford's scheme *after* he had attempted to obtain funding for his pre-existing plan from 1) representatives at a synagogue and 2) individuals at another Jewish organization, both in the Albany, NY area. This is not like *Cromitie* where the defendant's first indication of a criminal mindset was a vague reference to wanting to "do something to America," which was then developed into a more full plan after contact with government agents. *Cromitie*, 727 F. 3d at 210. Instead, Crawford specifically referenced the technology that he wanted to acquire and what he intended to use it for. That the defendant's plan was so developed is what originally caused the FBI to be concerned about the defendant's actions once it learned of his solicitations. The government, by definition, could not have induced the defendant to do something he had already begun on his own. Crawford's plan originated with him, and the Government expects to present at trial lawfully intercepted communications of him discussing his prior, independent research and work on his plan. Actions of government agents that merely afford an opportunity for a defendant to commit a crime do not defeat prosecution. *Cromitie* 727 F. 3d at 204 (citing

*Jacobson*, 503 U.S. at 548).   The Government anticipates that through the evidence it will introduce in its case in chief at trial, the defendant will not be able to meet the "relatively slight" burden of establishing inducement.

If the defendant could somehow get past the evidence of his own actions and intercepted statements and establish inducement, the government would then be required to prove his predisposition beyond a reasonable doubt.  *Id.*  The three circumstances that are accepted in this circuit for establishing predisposition are; "an existing course of similar criminal conduct; the accused's already formed *design* to commit the crime or similar crimes; his willingness to do so, as evinced by ready compliance."  *Id.* at 205 (quoting *United States v. Becker*, 62 F.2d 1007, 1008 (2d Cir. 1933) (emphasis in original). Predisposition must be shown prior to contact with a government agent.  *Id.* at 208.

Few courts have addressed the meaning of the word design as it relates to the entrapment defense, and "design" can be ambiguous without definition.  *Cromitie*, 727 F.3d at 206.  Its meaning must be taken from the context of the type of crime it is associated with.  *Id.* at 207. Because of the broad and varied acts of terrorism, the design of a terrorism crime "…need be only a rather generalized idea or intent to inflict harm…"  *Id.*  Having a "preexisting purpose" to commit the offense, or a similar crime, is sufficient "design" to satisfy the predisposition element in a terrorism context.  *Id.*

Here, the defendant's preparatory work and efforts to find and obtain a financial sponsor for his scheme – before and at his first contact with law enforcement - establish his predisposition under the second category, *i.e.*, having a pre-existing design.

As discussed above, evidence at trial will show that Crawford had the requisite design, prior to contact with government agents, sufficient to prove predisposition.  He already had his plan in mind when he went to the synagogue and called the Jewish organization to obtain funds for his plan.  While details of the "off the shelf" technology the defendant told his would-be financiers he could obtain would be revealed later in the investigation, the evidence at trial will make clear the radiation emitting device is the device he was pitching to the synagogue and Jewish organization that he claimed would kill the enemies of Israel in their sleep.  Also, when Crawford first met with the CHS, he described his plans in detail, and brought with him and revealed his prior research and planning, which included:  webpage printouts of a radiation emitting device, a webpage printout about radiation sickness, and his hand drawn sketch of a completed device, all indicating that he formed the plan prior to meeting with the CHS.  Based on the above legal requirements and anticipated evidence at trial, the defendant will not be able to meet the threshold requirements to have the Court instruct the jury on entrapment.

D.     EVIDENTIARY ISSUES

1.     Audio Recordings and Transcripts

The government will offer into evidence audio and video recordings of selected conversations between the defendant and others related to his criminal activities, including his co-conspirator, proxies, co-workers, commercial suppliers and vendors of materials used to assemble his remote initiation devices, a cooperating witness, a confidential human source, and undercover law enforcement officers.  Some recordings were consensually made; others were intercepted pursuant to Title III and judicial authorization. Recordings of a defendant's conversations are direct evidence of the contents of the conversations, and are admissible against the defendant under Federal Rule of Evidence 801(d)(2).

Audio recordings are independently admissible even where one or more parties to the conversation also testifies, *Nixon v. Sirica*, 487 F.2d 700, 718 (D.C. Cir. 1973); *United States v. Bonanno*, 487 F.2d 654, 659-60 (2d Cir. 1973), based upon a showing of authenticity, accuracy, and relevance.  *United States v. Fuentes*, 563 F.2d 527, 532 (2d Cir. 1977); *United States v. Knohl*, 379 F.2d 427, 440 (2d Cir. 1967).  The decisions of the Second Circuit "reveal a clear preference for the admission of recordings notwithstanding some ambiguity or inaudibility, as long as the recordings are probative."  *United States v. Arango-Correa*, 851 F.2d 54, 58 (2d Cir. 1988).

A recording that is partially inaudible is, therefore, generally admissible unless the unintelligible portions are so substantial as to render the entire recording untrustworthy.  *United States v. Bryant*, 480 F.2d 785, 790 (2d Cir. 1973).  Partial inaudibility goes to weight and not admissibility.  *United States v. Weiser*, 428 F.2d 932, 936-937 (2d Cir. 1969).  If a tape is deemed partially inaudible, the court should provide a cautionary instruction which warns the jury to disregard the inaudible portion.  *United States v. Skillman*, 442 F.2d 542, 552 n.8 (8th Cir. 1971).

It is not necessary to have either the operator of the tape recorder or a witness to the conversation testify, where other evidence supports a finding of accuracy.  *Fuentes,* 563 F.2d at 532-33.  The existence of the recordings themselves shows that the machine was capable of picking up sounds, *United States v. Moss*, 591 F.2d 428, 433 (8th Cir. 1979), and that the operator was competent.  *United States v. Bright*, 630 F.2d 804, 819 (5th Cir. 1980).  A consensual recording is, therefore, admissible without calling the informant who participated in it.  As the Second Circuit noted in *United States v. Barone*:

> . . . the government is not required to call as a witness a participant in a recorded conversation in order to authenticate the recording; it may lay the foundation for

19

the recording through the testimony of the technician who actually made it. A proper foundation for the [recording at issue] was therefore laid through the testimony of the agent who operated the recording device.

913 F.2d 46, 49 (2d Cir. 1990) (internal citations omitted).

Finally, with respect to the chain of custody of tape recordings, the Second Circuit ruled in *United States v. Steinberg*, 551 F.2d 510 (2d Cir. 1977), that there is no chain of custody requirement for audio recordings:

Appellant [] urges that the government should have been required to prove the chain of possession of the tape recordings from the time they were made to the time of trial. No statute or court rule imposes such a burden on the government, and the testimony of [the agent] as to the authenticity and accuracy of the tapes laid a sufficient foundation for their admission.

*Id.* at 515; *see also United States v. Amrep Corp.*, 560 F.2d 539 (2d Cir. 1977).

Further, the use of transcripts of recordings has been specifically approved by the Second Circuit. *See United States v. Carson*, 464 F.2d 424, 436-37 (2d Cir. 1972); *United States v. Chiarizio*, 525 F.2d 289 (2d Cir. 1975). The need to identify the speakers is a reason why the jury should be permitted to read a transcript of an audio recording. *United States v. Slade*, 627 F.2d 293 (D.C. Cir. 1980).

It is permissible for the jury to have the transcripts of conversations during deliberations. *See United States v. Koska*, 443 F.2d 1167 (2d Cir. 1971); *Carson,* 464 F.2d at 437.

In *United States v. Chiarizio, supra*, the court stated that "[i]n cases where the defense and prosecution disagree as to the contents of the tape, the proper procedure is for the jury to receive transcripts of both sides' versions." 525 F.2d at 293. The court should also listen to the tapes, comparing them to the transcripts, in such cases. *Id.*

If the jury so requests, it is within the discretion of the trial judge to permit the jury to rehear the tapes and to utilize the transcripts while the tapes are being replayed during

20

deliberation. *United States v. Faison*, 393 F. App'x 754, 759 (2d Cir. 2010) (district court did not abuse its discretion in granting the jury's request to view the transcripts of recordings of phone conversations. The court properly instructed the jury that only the recordings were evidence, not the transcripts);  *United States v. Rosa*, 17 F.3d 1531, 1548 (2d Cir. 1994) (the court, in its discretion, may allow the use of such transcripts if it instructs the jury clearly that the transcripts themselves are not  evidence and may be used only as aids in listening to the audio tapes and as nonbinding guides that are subject to the jurors' own assessment of the transcripts' accuracy); *United States v. Alfonso*, 552 F.2d 605, 618-619 (5th Cir. 1977); *United States v. Turner,* 528 F.2d 143, 167-68 (9th Cir. 1975); *United States v. Cioffi*, 493 F.2d 1111 (2d Cir. 1974). *See also United States v. Hemmings*, No. 07CR421NGJMA, 2009 WL 1616517, at *2 (E.D.N.Y. June 9, 2009) subsequently aff'd, 482 F. App'x. 640 (2d Cir. 2012).

2.      Statements of Co-Conspirators

The co-conspirators exception to the hearsay rule is based upon principles of agency and substantive law.  *See Anderson v. United States*, 417 U.S. 211, 218 n.6 (1974).  It was first recognized by the Supreme Court in *United States v. Gooding*, 25 U.S. 460, 469 (1827) and is now embodied in Fed. R. Evid. 801(d)(2)(E).

Fed. R. Evid. 801(d)(2)(E) provides that a statement is not hearsay if . . . [it] "is offered against an opposing party and was made by the party's co-conspirator during and in furtherance of the conspiracy."

Fed. R. Evid. 104 also governs the application of the co-conspirators exception to the hearsay rule.  *Bourjaily v. United States*, 483 U.S. 171 (1987).  Before a co-conspirator's statement is admissible against a defendant, the government must show (1) that a conspiracy existed, (2) that both the defendant and the declarant were members of the conspiracy, and (3)

that the statement was made during the course of and in furtherance of the conspiracy.  *United States v. Coplan*, 703 F.3d 46, 82 (2d Cir. 2012).

The existence of the conspiracy need only be proven by preponderance of the evidence, *Bourjaily v. United States*, 483 U.S. at 176; *United States v. Coplan* at 82.  The statements being offered may themselves be considered in determining whether a conspiracy existed, *Bourjaily v. United States*, 483 U.S. at 180; and when the existence of a conspiracy has been shown, evidence sufficient to link another defendant to it need not be overwhelming.  *United States v. Rivera*, 971 F.2d 876, 890-91 (2d Cir. 1992) (quoting *United States v. Provenzano*, 615 F.2d 37, 45 (2d Cir. 1980).  Statements of co-conspirators are admissible against a defendant even where the co-conspirators are <u>not</u> also defendants at the trial.  *United States v. John*, 508 F.2d 1134, 1143 (8th Cir. 1975).

"As a concession to the practicalities of proof, since an entire case cannot be put in simultaneously but must proceed in sequence, the trial court in its discretion may admit a particular piece of evidence 'subject to connection'".  *United States v. Ziegler*, 583 F.2d 77, 80 (2d Cir. 1978).  *See also United States v. Geaney*, 417 F.2d 1116, 1120 (2d Cir. 1969).  However, when all the evidence is in, the trial judge must determine "whether in his view the prosecution has proved participation in the conspiracy, by the defendant against whom the hearsay is offered, by a fair preponderance of the evidence."  *Geaney*, 417 F.2d at 1120.

It is the trial judge who must make this preliminary determination as to admissibility against the non-declarant co-conspirators.  *See United States v. Mastropieri*, 685 F.2d 776 (2d Cir. 1982); *United States v. Ziegler*, 583 F.2d at 80.  The determination of this issue by the Court should be outside the presence of the jury, and the Court should <u>not</u> advise the jury of the Court's findings that the government has satisfactorily proved the conspiracy.  *See United States v.*

*Vinson*, 606 F.2d 149, 153 (6th Cir. 1979).  However, if the Court has admitted the previously disputed evidence "subject to connection", then, in the presence of the jury the Court should inform the jury that such evidence is now admissible for all purposes.  Once the Court makes the determination that such declarations, previously admitted subject to connection, are admissible because the United States has made a sufficient showing, all co-conspirator statements go to the jury "to consider along with all the other evidence in determining whether they are convinced of a defendant's guilt beyond a reasonable doubt".  *United States v. Mastropieri*, 685 F.2d at 788.

      3.     Testimony Concerning the Sum and Substance of Events and Conversations

Witnesses will be asked to testify concerning their recollection of events and conversations.  Testimony concerning the substance of conversations is clearly admissible in accordance with the general rule that "…the substance or effect of the actual words spoke will suffice, the witness stating this substance as best as he can from the impression left upon his memory."  3 Wigmore on Evidence §2097 (3d Ed. 1940).  The witness' inability to provide further detail is then considered by the jury in deciding the weight that such testimony shall be given.

Case law sanctions this sensible approach, requiring that the witness relate the "substance or effect" and "context of the statement" as a whole.  *See United States v. Castro,* 813 F.2d 571, 576 (2d Cir.), *cert. denied,* 484 U.S. 844 (1987).  This rule recognizes that "verbal precision cannot be expected when the source of evidence as to an utterance is the memory of a witness." *Id.*  Accordingly, the witnesses should be allowed to state their best recollection of the substance of events and conversations.

      4.     Leading Questions

Should a witness called by the United States during the trial become "hostile" in the sense of becoming reluctant to fully and completely answer questions during direct examination

because of their relationship to the defendant, or out of fear of the defendant, the government will ask the court to permit us to ask leading questions under the authority of Rule 611(c) of the Federal Rules of Evidence, which provides, in pertinent part:

> Leading Questions. Leading questions should not be used on the direct examination of a witness except as may be necessary to develop his testimony. … [W]hen a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions.

Rule 611(c) superseded Federal Rule of Civil Procedure 43(b) and enlarged the category of persons automatically regarded and treated as "hostile."  The Advisory Committee noted that: "The new rule was designed to enlarge the categories of witnesses automatically regarded as adverse, and therefore subject to interrogation by leading questions without further showing of actual hostility."  *Ellis v. City of Chicago,* 667 F.2d 606, 613 (7th Cir. 1981).

Whether leading questions may be asked on direct examination is a matter within the sound discretion of the trial court.  *United States v. DeFiore,* 720 F.2d 757, 764 (2d Cir. 1983); *United States v. Brown,* 603 F.2d 1022, 1025-26 (1st Cir. 1979); 3 Wigmore on Evidence §§ 774-778 (3d ed. 1940).  To establish that a witness is "hostile," the Government need not show that the witness is "contemptuous or surly."  *United States v. Brown,* 603 F.2d at 1026.  It is enough that the witness be "evasive and adverse to the [G]overnment."  *Id.*  Furthermore, should a witness become confused, disoriented, incapable of concentration, or experience temporary lapses of memory, the court can permit leading questions on direct examination where the effect is to clarify testimony or stimulate an accurate recollection rather than implant a false one.  *See United States v. McGovern,* 499 F.2d 1140, 1142 (1st Cir. 1974).

5.      Chain of Custody

An uninterrupted chain of custody is not a prerequisite to admissibility of an exhibit. "Gaps in the chain go to the weight of the evidence, not its admissibility".  *United States v.*

*Morrison,* 153 F.3d 34, 57 (2d Cir. 1998).  "The government need not" rule out all possibilities inconsistent with authenticity, or . . . prove beyond any doubt that the evidence is what it purports to be."  *United States v. Jackson*, 345 F.3d 59, 65 (2d Cir. 2003).  "If the trial judge is satisfied that in reasonable probability the evidence has not been altered in any material respect, he may permit its introduction".  *United States v. Olson,* 846 F.2d at 1116, (quoting *United States v. Aviles,* 623 F.2d 1192, 1198 (7th Cir. 1980)).

> Federal Rule of Evidence 901(a) provides that:

> The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

Proof of the connection of an exhibit to the defendant may be made by circumstantial evidence.  *United States v. Mendel,* 746 F.2d 155, 167 (2d Cir. 1984),; *United States v. Howard-Arias,* 679 F.2d 363, 366 (4th Cir. 1982); *United States v. Natale,* 526 F.2d 1160, 1173 (2d Cir. 1975),.  *See United States v. Kubiak,* 704 F.2d 1545, 1552 (11th Cir. 1983).  "[T]he prosecution need only prove a rational basis from which to conclude that the exhibit did in fact belong to the [defendant]."  *United States v. Mendel,* 746 F.2d at 167; *United States v. Natale,* 526 F.2d at 1173.  "The ultimate question is whether the authentication testimony is sufficiently complete so as to convince the court of the improbability that the original item had been exchanged with another or otherwise tampered with."  *United States v. Mendel,* 746 F.2d at 167; *United States v. Howard-Arias,* 679 F.2d at 366; *United States v. Grant,* 967 F.2d 81, 83 (2d Cir. 1992).

6.    Expert Testimony

The Government has given notice that it will present expert testimony concerning the defendant's x-ray radiation device, specifically that: (1) if used in a manner consistent with that planned by the defendant against his intended human targets, it was capable of releasing radiation at a substantial levels, sufficient to endanger human life and producing radiation at

levels harmful to humans; and (2) if used as intended by the defendant, the device was capable of producing absorbed doses from exposures of radiation in human targets/victims that would have produced medical symptoms and biological effects that would have been dangerous to, and/or lethal to, human targets of various ages, health, and size.  The testimony of the two experts, one a radiation and nuclear physicist and the other a medical doctor specializing in radiation therapy and nuclear medicine, will assist the jury to understand the radiation and physics capabilities of the defendant's device, as he believed it to be, and the medical and biological effects of radiation emitted by such a machine and absorbed by human targets, directly addressing the elements of Count One and within the scope of Federal Rule of Evidence 702.

      7.     Jury Viewing of Crawford's X-Ray Device

The Government intends to produce the x-ray device and will request that the Court permit the jury to view it in a secured room within the courthouse.

As made plain above, Crawford's x-ray device is at the core of all three charges in the Indictment.  Most of the proof at trial will concern Crawford's attempt to produce, construct, acquire, transfer, receive, possess, and use the device, and his conspiracy with Feight to modify and enhance this device by designing, building, testing and integrating a remote initiation system into its control panel.  The device itself is very real, and its size, relative weight, component composition, and portability are directly relevant to the charged offenses. Juror inspection of it will give context to, and corroborate, other evidence the jury will see and hear. Where such a central item of evidence is relevant for the purposes for which it is admitted, and its probative value is not substantially outweighed by unfair prejudice to the defendant, its admission is proper and will be upheld.  *United States v. Shakur*, 888 F.2d 234, 238 (2d Cir. 1989).  *See also United States v. Aref,* 285 Fed. App'x. 784 (2d Cir. 2008) (missile introduced into evidence); *United States v. Aguirre,* 87 F. App'x. 200, 204 (2d Cir. 2004) (admission of hollowed-out magazine

seized in investigation "properly admitted"); *United States v. Ivanova*, 19 F. Supp. 3d 511, 515-16 (S.D.N.Y. 2014) (if the government sufficiently connects the evidence collected to the charged crimes, then it is admissible as the "tools of the trade" of the crimes – upholding admission of evidence of firearms as "tools of the trade" of drug conspiracy).  "[T]he trial judge has wide discretion in this area..."  *United States v. Ravich*, 421 f.2d 1196, 1204-05 (2d Cir. (1970).

> 8.  Presentation of Witnesses and the Recalling of Government Witnesses to the Stand

It is likely that approximately five of the government's critical witnesses (S/A West, S/A Kent, UCE #1, UCE #2 & UCE #3) will testify to multiple facets of the investigation.  Pursuant to Fed. R. Evid. 611(a), the government will seek permission to call the aforementioned witnesses to the stand multiple times in order to facilitate an orderly, efficient, chronological and understandable presentation of the evidence.  *United States v. Jackson*, 549 F.2d 517, 528 (8th Cir. 1977*); United States v. Butera*, 677 F.2d 1376, 1381 (11th Cir. 1982).

> 9.  Agents Summarizing the Multiple Hours of Audio and Video Recordings Capturing the Defendant Discussing His Plan is Admissible Under Rule 1006 of the Federal Rules of Evidence

In lieu of playing all dozens/hundreds of hours of audio and video recordings capturing the defendant's efforts to advance his plan, the government requests the Court's permission to play only a fraction of each of the audio and video recordings (cumulatively, the government will seek to play about eight hours of recordings during its case in chief) for the jury and to have the remainder summarized by the case agent or other investigators.  Playing the entire length of each audio or video recording would be impracticable and a needless consumption of time and judicial resources.  Such a procedure is permissible under Rule 1006 of the Federal Rules of Evidence as summaries need not only be in the form of a chart or graph.  Rather, summary evidence may be

presented in the form of the testimony of a witness.  *See Nichols v. Upjohn Co.*, 610 F.2d 293, 294 (5th Cir. 1980); *Colorado Coal Furnace Distrib., Inc. v. Prill Mfg. Co.*, 605 F.2d 499, 505 (10th Cir. 1979); *Heinzerling v. Goldfarb*, 359 N.J.Super. 1, 9-13; 818 A.2d 345 (2002); *see also Cissell*, Federal Criminal Trials, 16.4, p. 426 (6th Ed. 2003); C. Muller & L. Kirkpatrick, Evidence, 10:16 at 1232 (Fed. R. Evid. 1006 authorizes the admission of written or testimonial summaries).

The original recordings that captured telephone calls and face-to-face meetings involving the defendant advancing his plan are admissible.  Clearly, dozens / hundreds of hours of such material is voluminous.  Further, the testimony will accurately summarize the contents of the recordings.

E.     MOTIONS IN LIMINE

The Government anticipates presenting to the Court very shortly two motions *in limine.* The first will request special measures for the entrance and exit to and from the courtroom and appearance while testifying for undercover witnesses, a confidential human source, and a cooperating witness, for the purpose of protecting the witnesses and his/her family's safety and, for two witnesses, the witness' identity to enable continued undercover work in ongoing and significant investigations.  The second motion *in limine* will seek authorization from the Court to limit public disclosure of certain terms and identifiers (proposed substitutions and alternatives will be proposed for the Court's consideration), very limited portions of the trial testimony of a small number of witnesses, and viewing of the defendant's x-ray radiation device.  We are awaiting final authorizations and information necessary prior to submitting those motions *in limine*, and will make those submissions as soon as possible.  We anticipate submitting those motions directly to counsel, under the terms of the existing Protective Order, and to the Court under seal.

28

F.      CONCLUSION

Through this trial memorandum, the Government has attempted to summarize and identify those principles of law and issues which we believe to be applicable in resolving issues that the Court may face during trial.  We respectfully request an opportunity to submit additional legal authority in connection with such other issues as may arise.